**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jonathan SEWARD, Hank Fisk, Peter Jamieson, Kim Korthuis, Colleen Malley, Jodi Linn Nadler, Lisa Hankins, Lynn Stratton, William Morgan, Dan C. Chancellor, Connie Gale Hypes, Mark Steven Roche, Dan Auer, Don Krasniewski, Dewayne Albert Ahrendt, and Abby Anthony, Defendants-Appellants.**

**Nos. 79–1711 to 79–1726 (Trial Group A).**

United States Court of Appeals,
Tenth Circuit.

June 17, 1982.

Rehearing Denied Aug. 11, 1982.

Certiorari Denied Jan. 17, 1983.

See 103 S.Ct. 789.

John S. Evangelisti of LaFond & Evangelisti, Denver, Colo. (Jonathan L. Olom, Denver, Colo., Tim Correll, Denver, Colo., Cathlin Donnell of Kelly, Haglund, Garnsey, Kahn & Donnell, Denver, Colo., and Clifford J. Barnard, Boulder, Colo., on the briefs), for defendants-appellants.

Nancy E. Rice, Asst. U. S. Atty., D. Colo., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with her on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, McKAY, LOGAN and SEYMOUR, Circuit Judges.

SETH, Chief Judge.

These are part of a series of eighty-six appeals from convictions for violating 42 U.S.C. §§ 2278a(a) and (b) and 10 C.F.R. §§ 860.3, 860.5(a), and 860.6. Some general background facts are in order.

On April 29, 1979, about 283 people were arrested at three different locations at Rocky Flats Nuclear Plant Site (Rocky Flats) in Jefferson County, Colorado. Rocky Flats is a Department of Energy (DOE) facility located sixteen miles northwest of Denver, and used for the production of nuclear components. Formerly under the jurisdiction and control of the Atomic Energy Commission (AEC) and the Energy Research and Development Administration (ERDA), the plant has been subject to DOE administration since 1977.

Rocky Flats was constructed in 1952 by the AEC and is now housed on a 6,500-acre site owned by DOE. DOE is responsible for the operations; Rocky Flats is operated by Rockwell International (Rockwell), a private contractor. DOE has approximately fifty employees at Rocky Flats, divided among administrative, operational, and construction functions. Rockwell has about 3,100 employees at the plant. All facilities are used for conducting government operations; Rockwell conducts no private research or activity.

The boundaries of this property were established in 1975 through land acquisition by a decree of taking filed in the United States District Court in Colorado. See Appendix A attached. The outer perimeter is surrounded by a barbed wire fence on which no trespassing signs are posted at intervals of 200 to 250 yards, except at corners where the signs are within a few feet of each other.

In addition to fee ownership of certain land, DOE also has easements, pursuant to certain declarations of taking, to the roadway extending from Colorado State Highway 93 to the edge of the western boundary of Rocky Flats (west access road) and to a 100-foot wide strip of land surrounding and including a railroad spur which runs west out of the western portion of the plant and then south to connect with the main line of the Denver and Rio Grande Railway. Testimony at the various trials indicates that the easements and ownership of the sites where these arrests occurred was acquired by DOE and its predecessor agencies in 1975 to add to the buffer zone around the inner facilities of the plant. The land surrounding these easements is owned by the state or by private individuals.

On April 28, 1979, the day *before* these defendants-appellants were arrested, permission was given by DOE through the Secretary of the Department of Energy for a demonstration to be conducted on Rocky Flats property at the northeastern edge. Ten or more acres inside the outer bound-

ary of the plant were roped off to permit demonstrators a forum to display their opposition to the continued existence of the plant. Specific authorization for this demonstration was in effect from 8:00 a. m. to 6:00 p. m. on April 28th. The demonstration was orderly and peaceable, and no arrests were made.

On April 29 three large groups of people returned to the plant site. Some of the 283 persons arrested subsequently pleaded guilty and were convicted. The remaining defendants were tried by four judges of the United States District Court for the District of Colorado in groups of approximately fifteen to twenty. In all, apparently eighteen trials took place on these charges in the summer of 1979. All defendants were found guilty and were fined various amounts up to the statutory maximum of $1,000.

In the district court the various trial groups were denominated by alphabetical letters. On appeal to this court, one or more defendants from trial groups A through F, I, and J through P have perfected the total of eighty-six appeals. The defendants in Group A, treated herein, were arrested at the east access road to the Rocky Flats plant.

The east access road to Rocky Flats runs from the inner facility of the plant east to the junction with Indiana Avenue, which runs north-south parallel to the eastern boundary of Rocky Flats. See Appendix A attached. This boundary is marked with a barbed wire fence on which no trespassing signs had been posted on April 25, 1979, some 20 to 25 feet west of Indiana Avenue. A solid white line is painted across the east access road at the edge (according to most testimony) of the federal boundary and the right-of-way of Indiana Avenue. (According to the government surveyor, however, this white line is actually 48 feet *inside* the boundary of the federal property.) On April 29 there were also temporary rope and sawhorse barricades strung across the white line to designate the boundary.

United States Deputy Marshal Louis DeAnde was in charge of three deputies and various Rocky Flats security force personnel at the east access gate. About noon on April 29, a group of approximately 60 people assembled on the east side of Indiana Avenue across from the entrance to the east access road. At 12:45 most of the group crossed to the west side of the highway where Ron Newby, a Rocky Flats security operations officer, read the first warning that the group was about to trespass on federal property and would be subject to arrest. The warning was made by the use of an electronic bullhorn.

The demonstrators continued to walk across the white line, through the temporary barricades and the first line of the Rocky Flats security guards. The security men dropped back to form a second line, at which time Marshal DeAnde gave a second warning.

The demonstrators then sat down or lay across the roadway approximately 20 to 30 feet west of the barricade. Marshal DeAnde repeated his warning and advised that those who did not wish to be arrested could leave. The demonstrators were then each *individually* warned they would be arrested if they did not leave. Those choosing not to leave were arrested, turned over to Rocky Flats security personnel, and escorted to a waiting bus. Each demonstrator was patted down, photographed with the arresting officer or security force person, and loaded onto the bus.

After defendants had been arrested and placed on buses, they were transported to a temporary site for processing. As each defendant was unloaded, he or she was photographed by a deputy marshal. Finally, the last deputy marshal handed each arrestee a summons and information.

Numerous motions to dismiss were filed by all defendants. On May 31, 1979, argument was heard at the omnibus hearing on the various grounds alleged in these motions. All defendants were deemed by the court to have joined in the motions of all

other defendants unless a defendant expressly asked that a motion not apply to him or her. For purposes of appellate review we consider all of these grounds alleged for dismissal as applicable to all defendants. All motions were denied.

The government filed a motion *in limine* seeking to prohibit defendants from presenting at trial the common-law defenses of duress or justification, encompassing defenses of necessity, self-defense, defense of others and defense of property. At the May 31 omnibus hearing, the trial court directed defense counsel to submit written offers of proof in advance of trial with regard to these types of defenses. Several such offers were filed by both trial groups and individual (occasionally pro se) defendants. The arguments are similar and show that various witnesses would have testified to the effects of radiation, risks of accidental leakage, soil contamination in the land surrounding Rocky Flats, and lack of viable political alternatives.

All of the trial judges joined in an order of June 7, 1979, setting the ground rules for the admissibility of certain defense evidence. In specifying the very narrow grounds under which such defenses could be established, the order stated:

"[U]nless there be an appropriate offer of proof, there will be no jury voir dire, there will be no opening statement, there will be no testimony, there will be no instructions and there will be no final argument as to a justification defense. Unless these strict requirements can be met, the cases will be tried for jury determination of whether defendants intentionally and wilfully trespassed on Rocky Flats property in violation of applicable federal law."

The restrictions on the introduction of evidence are summarized as follows:

1. No evidence will be received offered to prove either the morality or immorality of nuclear weapons or nuclear power.

2. No evidence will be received offered to establish good or bad motive on the part of defendants.

3. No evidence will be received offered in support of or in opposition to the wisdom of any political question or any government policy.

4. No evidence will be received offered to show the correctness or incorrectness of or the advisability or inadvisability of any legislative act or any executive action insofar as that evidence is offered in support of any type of justification defense as that phrase is explained in the body of this opinion or in the cases referred to in this opinion.

5. No evidence will be received in support of any argument that actions were taken or that the law was defied because of an individual's belief that he had a right to determine governmental policy.

6. No evidence of religious belief offered as a defense to this criminal charge will be received.

7. Unless the offer of proof meets the very narrow limits of justification defenses, evidence in support of those defenses will not be received. Whether the offers meet this standard is something which will be decided by the court and not by the jury. Among other things, the proffered evidence will have to show:

1) A direct causal relationship between the defendant's actions and the avoidance of the perceived harm. This includes a showing that a reasonable man would think that blocking entry to Rocky Flats for one day would terminate the official policy of the United States government as to nuclear weapons or nuclear power.

2) The act to be prevented by defendant's conduct was criminal under the law of the United States. A defendant's belief that the government approved conduct violated some religious or moral code is not sufficient.

3) The alleged criminal act which defendants wanted to stop was one occurring in their presence, and was one

which would subject them to immediate harm which a reasonable man would think could be eliminated by defendants' conduct. [*See, Hawaii v. Marley*, 54 Haw. 450, 509 P.2d 1095, 1108.] In the words of this case:

"To rule that a full justification defense to the prosecution for commission of crime is established even absent a presence requirement would be to create a very dangerous precedent, for it would make each citizen a judge of the criminality of all the acts of every other citizen, with power to mete out sentence."

4) There was no alternative available to defendants to accomplish their purpose which did not involve a violation of the law. If there were forms of non-criminal protest available, "to enable them to dramatize, and hence hopefully terminate," the nuclear program of the United States, the prerequisites to a necessity defense aren't there.

In so ruling, the trial court relied on *United States v. The Diana*, 74 U.S. (7 Wall.) 354, 19 L.Ed. 165 (1869); *United States v. Simpson*, 460 F.2d 515 (9th Cir. 1972); *United States v. Cullen*, 454 F.2d 386 (7th Cir. 1971); *United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969); *Shannon v. United States*, 76 F.2d 490 (10th Cir. 1935); and *State of Hawaii v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973).

Based on this order, all offers of proof by all defendants were denied.

Trial Group A raises the following issues on appeal to this court:

1. The trial judge erred in refusing to allow appellants to present to the jury the defense of "necessity" or "choice of evils."

2. The convictions are invalid because the designation of boundaries in the Federal Register on April 13, 1979 fails to comply with the provisions of 5 U.S.C. §§ 551 et seq., 42 U.S.C. §§ 7191 et seq., and 10 C.F.R. §§ 860.1, et seq., as well as internal DOE standards published at 44 Fed. Reg. 1032 (January 3, 1979).

3. The federal government was without jurisdiction to prosecute the trespass charges without first filing a notice of acceptance of jurisdiction with the Governor of Colorado as provided in 40 U.S.C. § 255.

4. The trial court unduly limited defendants' Fifth Amendment right to testify in their own behalf.

5. The trial judge erred in requiring that appellants submit to fingerprinting at midtrial. Appellants claim the procedure violated both the requirement that discovery be completed prior to trial and appellants' Sixth Amendment right to effective assistance of counsel.

The government's motion *in limine* was directed to the defenses of "necessity" or "choice of evils" which had been raised by the defendants, and asked that the admissibility of certain kinds of evidence relating thereto be considered prior to the trials. The court ruled that none of the testimony or evidence proffered by defendants was relevant to the issues to be tried. The offer of proof by defendants described the witnesses and the evidence sought to be offered. The following is typical. Thus "Dr. Morgan would have testified as to the alpha radiation from plutonium and the health hazards therefrom. Also that: 'It is now his opinion that the official minimum acceptable dosages are far too high, and lead to a significant risk of cancer among those persons who are associated with radioactive elements.' Also that the Rocky Flats Plant 'represents a danger to persons living in the general vicinity of the Plant.' Also that past operations have contaminated the 'local environment at a level he would consider serious.'" Also, Dr. Gofman would have testified in a similar way as would Dr. Martel, Dr. Johnson, and Mr. Wolfman.

"Necessity" appears to be a suitable term for the broad doctrine here sought to be

advanced as a defense. Relatively few opinions have considered "necessity" in this context, but included in this group are *United States v. The Diana*, 74 U.S. (7 Wall.) 354, 19 L.Ed. 165 (1869); *United States v. Simpson*, 460 F.2d 515 (9th Cir. 1972); *United States v. Cullen*, 454 F.2d 386 (7th Cir. 1971); *United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969); *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973). We considered the "coercion" aspect in *Shannon v. United States*, 76 F.2d 490 (10th Cir. 1935). *See also* 1 Wharton's Criminal Law § 88 (14th ed. 1978).

The defendants in *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973), were charged with criminal trespass on the Honeywell corporate property in Honolulu. Asserting they were seeking to stop the Viet Nam War, they raised, among others, the defense of necessity. The court in its syllabus stated in part:

"The 'necessity defense' exonerates persons who commit a crime under the pressure of circumstances if the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendant's breach of the law.

"Successful use of the 'necessity defense' requires (a) that there is no third and legal alternative available, (b) that the harm to be prevented be imminent, and (c) that a direct, causal relationship be reasonably anticipated to exist between defendant's action and the avoidance of harm."

The court in its consideration of the causal relationship element further stated:

"Under any possible set of hypotheses, defendants could foresee that their actions would fail to halt Honeywell's production of the war material, the production of which defendants assert to be a war crime. Since no reasonable man could find otherwise, it was not error for the judge to have omitted an instruction on the 'necessity defense.'"

As to alternative courses of action, the *Marley* court said in the body of the opinion:

"Where there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. LaFave and Scott, Criminal Law, p. 387; *Bice v. State*, 109 Ga. 117, 120, 34 S.E. 202, 203 (1899); *United States v. Holmes*, 26 F.Cas. 360, 367 (No. 15,383) (C.C.Pa. 1842)."

The reference in *Marley* to the causal connection is from *United States v. Simpson*, 460 F.2d 515 (9th Cir. 1972), where the court was considering an appeal from a conviction for burning Selective Service Board records in an effort to stop the war in Asia. In considering the "justification" doctrine and the trial court's refusal to permit evidence to be introduced or to instruct on justification, the court in *Simpson* said:

"Here, it is apparent that Simpson's reckless, dangerous acts were not reasonable. An essential element of the so-called justification defenses is that a direct causal relationship be reasonably anticipated to exist between the defender's action and the avoidance of harm."

■ It is apparent from the defendants' offer of proof that the "necessity" defense was not applicable as several essential elements were lacking. The basic one lacking was real necessity because, under the offer of proof, there were courses of action open to the defendants other than criminal trespass. The references to attempted political action were inadequate and only referred to attempts by other persons. This clearly cannot be sufficient.

The Supreme Court in *United States v. The Diana*, 74 U.S. (7 Wall.) 354, 19 L.Ed. 165 (1869), used very strong language to describe the defense there sought to be advanced in an incident wherein a ship crossed the federal blockade. The Court said in part:

"It is undoubtedly true that a vessel may be in such distress as to justify her in attempting to enter a blockaded port. She may be out of provisions or water, or

she may be in a leaking condition, and no other port be of easy access. The case, however, must be one of absolute and uncontrollable necessity; and this must be established beyond reasonable doubt. 'Nothing less,' said Sir William Scott, 'than an uncontrollable necessity, which admits of no compromise, and cannot be resisted,' will be held a justification of the offense. Any rule less stringent than this would open the door to all sorts of fraud. Attempted evasions of the blockade would be excused upon pretenses of distress and danger, not warranted by the facts, but the falsity of which it would be difficult to expose."

■ The offer of proof did not present facts to bring the defendants within the doctrine. The Court in *Diana* used somewhat stronger language than more recent cases, but under any test now prevailing the defendants must fail. The defense of necessity does not arise from a "choice" of several courses of action, it is instead based on a real emergency. It can be asserted only by a defendant who was confronted with such a crisis as a personal danger, a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts. It is obviously not a defense to charges arising from a typical protest.

The Supreme Court in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), an escape case, considered a related issue. There, the trial court refused to instruct on the defense of duress and necessity. Much of the opinion is concerned with "intent"; however, the Court did hold that an "indispensable element of the defense of duress or necessity" was lacking. The Court said:

"We need not speculate now, however, on the precise contours of whatever defenses of duress or necessity are available against charges brought under § 751(a). Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail. LaFave & Scott 379. Clearly, in the context of prison escape, the escapee is not entitled to claim a defense of duress or necessity unless and until he demonstrates that, given the imminence of the threat, violation of § 751(a) was his only reasonable alternative. See *United States v. Boomer*, 571 F.2d 543, 545 (CA 10), cert. denied sub nom. *Heft v. United States*, 436 U.S. 911 [98 S.Ct. 2250, 56 L.Ed.2d 411] (1978); *People v. Richards*, 269 Cal.App.2d 768, 75 Cal.Rptr. 597 (1969)."

■ We must hold that under the prevailing authorities the defendants failed in their offer of proof to meet several of the requirements necessary to permit the trial court to submit the necessity defense to the jury. As in *Bailey*, at least one "indispensable element" was lacking. The trial court did not abuse its discretion in the pretrial consideration of the defense. This is clearly demonstrated by the last quotation above from *Bailey*.

The issue as to the validity of the regulation sought to be enforced is controlled by our decision in *United States v. Thompson*, 687 F.2d 1279 (10th Cir.), filed this date.

Defendants also argue that jurisdiction to prosecute is lacking because of a 1940 statute, 40 U.S.C. § 255, which provides in relevant part as follows:

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interest therein under his immediate jurisdiction, custody, or con-

trol are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

■ The defendants urge that the government should have filed an "acceptance of jurisdiction" over the Rocky Flats site with the Governor of Colorado, that under 40 U.S.C. § 255 an acceptance is necessary to give jurisdiction to enforce the regulations as to trespass. They cite *Adams v. United States*, 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943).

No notice of acceptance has been filed. These cases, however, do not concern concurrent or exclusive jurisdiction over crimes committed on the facility such as the rape charge in *Adams v. United States*, nor the crimes in *United States v. Cassidy*, 571 F.2d 534 (10th Cir. 1978), of seizing hostages, assault, and conveying firearms into a penal institution. Instead, the concern is with the protection by the government of its own property. This power arises from the property clause of the Constitution, art. IV, § 3, cl. 2. The Fifth Circuit in *United States v. Gliatta*, 580 F.2d 156 (5th Cir. 1978), considered the enforcement of regulations concerning the use of government property. The court there referred to *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), for the distinction between the property clause and the unrelated doctrine of exclusive jurisdiction. We agree with the analysis in *United States v. Gliatta*. *See also United States v. Brown*, 552 F.2d 817 (8th Cir. 1977). The acceptance argument is thus unrelated to the facts before us.

■ The defendants-appellants in Groups A and M urge that the trial court unduly restricted the scope of their evidence and testimony by the pretrial rulings of June 7th, in response to the motion *in limine*, which we upheld as valid in our discussion above.

The trial judge in Group A informed the defendants as follows:

"I will let any defendant who cares to testify that the defendant did not think he or she was violating the law, but I won't let then [sic] give any reasons. I won't let them give any arguments. But if they wish to testify to the lack of intent, they are more than welcome to do so. I am not going to let them explain why."

Some defendants in Group A argue that consequently they did not testify, because the scope of their testimony would have been limited.

Each defendant in Group M took the stand and stated that he or she did not intend to break the law and did not act willfully. The order limited testimony to their intent, but the defendants in Group M were permitted to testify on this general subject well beyond the order. The transcript so demonstrates in over a hundred pages of such testimony. Each defendant stated his or her purpose in performing the act—as a personal statement, to obstruct traffic to the plant, a symbolic act, to protest Rocky Flats, to make the public aware, for the children, to support life, and similar positions. The record thus shows that there were no undue restrictions on the right to testify as a practical matter. The defendants stated their personal reasons for doing what they did.

The trial court ruling on the motion *in limine* relied on *United States v. Cullen*, 454 F.2d 386 (7th Cir. 1971), *United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969), and *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973). We have considered these cases already in this opinion and we conclude that they support the rulings of the trial court

here. The court's actions were also clearly within the trial court's discretion in limiting evidence to relevant issues.

At trial, the court directed each defendant to furnish a sample fingerprint of his or her right index finger for comparison with the fingerprint taken by United States Deputy Marshal Steve Proesch at the time of processing in Lakewood. Defendants objected on grounds that the procedure violat-ed the requirement that discovery be completed prior to trial and that it forced defendants to identify themselves. This issue is controlled by our decision in *United States v. Peters,* 687 F.2d 1295 (10th Cir.), filed this date.

For reasons set forth in this opinion and that in *United States v. Thompson* and *United States v. Peters,* filed this date, the judgments are affirmed.

## APPENDIX A

[FR Doc. 79-11571 Filed 4-12-79; 8.45 am]
BILLING CODE 6450-01-C