Dean SEIBOLD, Appellant,

v.

STATE of Alaska, Appellee.

No. 1593.

Court of Appeals of Alaska.

May 29, 1998.

William R. Satterberg, Fairbanks, for Appellant.

Joseph S. Slusser, Assistant District Attorney, Harry L. Davis, District Attorney, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER, J., and JOANNIDES, District Court Judge.*

## OPINION

COATS, Chief Judge.

Dean Seibold was convicted, following a jury trial, of criminal mischief in the third degree, a class A misdemeanor. AS 11.46.484. Seibold appeals his conviction to this court, arguing that District Court Judge Charles R. Pengilly erred in refusing to instruct the jury on the defense of necessity. We reverse Seibold's conviction.

On September 25, 1995, Paul Knopp was driving home to his farm near Delta Junction in his flatbed truck. Dean Seibold, a neighbor of Knopp, was on the highway behind Knopp. When Knopp slowed down to turn into his driveway, there was a collision between the two trucks. Knopp drove seventy-five to one hundred feet up the driveway. Seibold followed, stopping his truck in Knopp's driveway. Seibold approached Knopp's truck, and an altercation occurred between the two men which resulted in Seibold breaking the window in Knopp's truck. Knopp testified that he was locking the door of his truck and rolling up the window as Seibold approached, and Seibold broke the window of the truck with his fist. He testified that Seibold attempted to assault him, but Knopp picked up a hammer from the floor of his truck, and Seibold retreated to his own truck. Seibold testified that when he approached Knopp's truck the window was still open, and that when he reached in to unlock the door Knopp closed the window on his arm. The window broke while Seibold was struggling to free his arm.

At this point Knopp's wife, Laure, approached from the driveway of the residence. Laure was carrying a nine-millimeter semi-automatic handgun in a shoulder holster and she was carrying a camcorder with which to film the incident. Apparently Seibold also had a camcorder with which he did some filming of the incident. There was then an altercation between Laure Knopp and Seibold. According to Laure Knopp, she told Seibold to get off of the Knopps' property. Seibold hit Laure on the side of the head, knocking her down. Seibold then took the nine-millimeter semi-automatic handgun from her. According to Laure Knopp, at this point Seibold's wife, Patty, who had arrived at the scene in her truck, assaulted Laure by grabbing her by the hair and flinging her into a ditch. According to Laure Knopp, Seibold then pointed the gun in the air and fired a shot. Seibold and Patty then went back to their truck. Seibold then put the gun on the ground, and destroyed it. According to Dean Seibold, when Laure arrived at the scene, Seibold was filming the Knopps with his camcorder. Laure starting hitting him, and in the course of defending himself, he was able to take the gun away from her. Seibold then tried to back away with the gun but Laure kept pursuing him, attempting to take the gun back from him. According to Seibold, the gun went off when he was pointing it toward the ground, trying to figure out how to unload the gun. Apparently the Seibolds had summoned the troopers on a handheld radio. However, Seibold testified that because the police had not yet arrived he felt that he had no choice but to destroy the gun. Seibold maintained that he destroyed the gun out of "total fear." He said he felt that he was in immediate danger from the gun even though he had control of it because he feared the Knopps might get it away from him. After he destroyed the gun, Seibold tossed it on top of his truck. Patty Seibold then left in her truck. A short time later Trooper Steve Baer arrived at the scene and Seibold handed him the handgun.

The state charged Dean Seibold with three misdemeanor offenses: criminal mischief in the third degree for smashing the window of Paul Knopp's truck, criminal mischief in the third degree for destroying the nine-millime-

---

* Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution.

ter handgun, and assault in the fourth degree for assaulting Laure Knopp. The state charged Patty Seibold with assaulting Laure Knopp. The state tried the Seibolds together in a joint trial. The Seibolds defended on the ground that they acted in self defense, and Judge Pengilly gave the jury instructions on self defense. Judge Pengilly stated that the evidence in support of self defense and defense of others was "very, very thin" but agreed to give the proposed instruction. However Judge Pengilly declined to instruct the jury on the defense of necessity, which Seibold contended was applicable to the criminal mischief charge for damaging the nine-millimeter semi-automatic. The jury acquitted the Seibolds on all of the charges except for the criminal mischief charge for destroying the handgun.

■ Seibold contends that Judge Pengilly erred in rejecting his request to instruct on the defense of necessity. Under Alaska law, the common-law affirmative defense of necessity is available to criminal defendants except where preempted by the legislature. AS 11.81.320; *Bird v. Anchorage*, 787 P.2d 119, 120 (Alaska App.1990). To establish a necessity defense the defendant must show that:

(1) the act charged was done to prevent a significant evil;

(2) there was no adequate alternative; and

(3) the harm caused was not disproportionate to the harm avoided.

■■ *Bird*, 787 P.2d at 121. The defense is established if the accused reasonably believed at the time of acting that the first and second elements were present, but a reasonable belief will not suffice for the third element; the court makes "an objective determination ... as to whether the defendant's value judgment was correct, given the facts as he reasonably perceived them." *Bird*, 787 P.2d at 120–21 (citing *Cleveland v. Anchorage*, 631 P.2d 1073, 1078 (Alaska 1981)). A defendant is entitled to a jury instruction on the necessity defense if he presents "some evidence" in support of each of the three elements of the defense. *Degler v. State*, 741

P.2d 659, 661 (Alaska App.1987); *Schnabel v. State*, 663 P.2d 960, 966 (Alaska App.1983).

■ In rejecting Seibold's request for a necessity defense, Judge Pengilly found that Seibold had not presented evidence that he had no reasonable alternative to destroying the gun. Judge Pengilly contended that the evidence showed that Seibold could have given the weapon to Patty Seibold or that Seibold could have locked the weapon in the cab of Seibold's truck.[1]

■■ We start out with the premise that a defendant is entitled to a trial by jury and that the court should instruct the jury on the defendant's defense. *Folger v. State*, 648 P.2d 111, 113–14 (Alaska App.1982). In determining whether a defendant has presented some evidence in support of his defense, "any weakness or implausibility in the evidence supporting [a defendant's] story is not a relevant consideration." *Toomey v. State*, 581 P.2d 1124, 1126 n. 10 (Alaska 1978); *Houston v. State*, 602 P.2d 784, 785–88 (Alaska 1979). In *Folger*, a case where the defendant alleged self defense, we stated:

We think a strong argument can be made that a trial judge should err on the side of giving instructions on self defense so as to avoid a needless appellate issue in cases in which a weak case for self defense is presented. We also think that in a case such as this where self defense is presented as a possible defense, there is a danger that the jury may consider its own understanding of what self defense is in the absence of an instruction from the court. It seems preferable to have the jury correctly instructed.

*Folger*, 648 P.2d at 114 n. 3. In general, similar considerations apply regardless of what defense the defendant proposes. The defendant is entitled to a jury trial, and it is the duty of the trial judge to instruct on any defense for which there is some evidence. In *Willett v. State*, 836 P.2d 955, 958 (Alaska App.1992), we stated:

"In order to satisfy the 'some evidence' test, it is not necessary that the defendant

---

1. Seibold testified that he did not give the handgun to Patty Seibold to take away from the scene because Patty was afraid of guns.

testify or even offer direct evidence in his own behalf. Some evidence establishing a dispute as to a factual issue may arise from weakness in the prosecution's evidence or from impeachment of its witness. Similarly, circumstantial evidence presented as part of the state's case-in-chief may give rise to some evidence of a disputed fact." *Nathaniel v. State,* 668 P.2d at 855 (Alaska 1983) (citations omitted). To determine whether this test has been met in a particular case the court must view the evidence in the light most favorable to the defendant. *Paul v. State,* 655 P.2d 772, 776 (Alaska App.1982). As long as there is some evidence to support the defendant's theory of the case, any weakness or implausibility in that theory is a matter for the jury, not for the court. *See Folger v. State,* 648 P.2d at 113.

Admittedly, there are some exceptions to this doctrine where the defense of necessity is concerned. There are several Alaska cases which conclude that trial judges did not abuse their discretion in refusing to give necessity defenses. However, we believe that a close reading of those cases establishes that the defendants in those cases had clear legal alternatives to violating the law. *See Nelson v. State,* 597 P.2d 977, 980 (Alaska 1979) (finding that defendant had several lawful alternatives and that "[t]he seriousness of the offenses committed by Nelson were disproportionate to the situation he faced."); *Schnabel,* 663 P.2d at 966 (holding that defendant "had adequate alternatives in judicial and administrative remedies to the course he took"); *Cleveland,* 631 P.2d at 1081 (holding necessity defense not available to abortion clinic protesters since "Alaska's Legislature has . . . already spoken as to the balancing before us, and concluded that the interests in potential life appellants sought to vindicate are outweighed by the very privacy interests in potential life appellants sought to invade."); *Gerlach v. State,* 699 P.2d 358, 361–63 (Alaska App.1985) (finding that noncustodial mother charged with custodial interference for taking her child out of the state for a year was not entitled to necessity instruction based on her claim that the child's father was abusive, because the harm she caused was disproportionate to the harm

avoided and because she "had adequate remedies at law. Her failure to avail herself of those remedies precludes her reliance on a necessity defense."). In all of the above cited cases, it seems clear that the defendants had clear legal alternatives. However this is not so in the present case. The general principle for which Seibold argues appears beyond dispute: it would be preferable for Seibold to destroy the handgun rather than have it used in an assault, which could have resulted in death or serious physical injury. The question that the case raises is whether it was necessary for Seibold to destroy the weapon to avoid this possibility. The answer to this question turns on the specific facts of the case and therefore falls particularly within the province of the jury. Although Judge Pengilly's view of the facts was that Seibold had several preferable alternatives to destroying the weapon, the jury might have taken a different view. We note that although Judge Pengilly described Seibold's self defense claims as "very, very thin" the jury ultimately acquitted based on that self defense theory. This illustrates that the jury might have taken a different view of the evidence than Judge Pengilly. Since Seibold was entitled to a jury trial, he was entitled to have the jury pass on the sufficiency of his defense.

We are also influenced, to some degree, by the statute which criminalizes criminal mischief in the third degree. AS 11.46.484(a)(1) provides:

> (a) A person commits the crime of criminal mischief in the third degree if, *having no right to do so or any reasonable ground to believe the person has such a right*
>
> (1) with intent to damage property of another, the person damages property of another in a amount of $50 or more but less than $500[.]

(Emphasis supplied.) In reviewing this case, we discovered that the trial court did not instruct on the language which we have emphasized in the statute. It occurred to us that the omitted language could arguably encompass a necessity defense. We therefore asked the parties to submit supplemental briefs discussing whether the omission of this language might constitute plain error.

The parties submitted supplemental briefs which were not helpful in resolving this question. The state alleged that the language in question merely exempted from prosecution a person who destroyed his own property or who acted in good faith on the belief he had authority to destroy the property. The state did not cite to any authority for this proposition. Seibold contended that the language in question authorized a necessity defense and that, therefore, the omission of this language constituted plain error. Seibold also did not cite any authority for this proposition. With this limited briefing, we do not believe that it is appropriate for us to attempt to interpret the statute.[2]

The conviction is REVERSED.

MANNHEIMER, Judge, dissenting.

When the defendant in a criminal case raises the affirmative defense of necessity, one of the elements the defendant must prove is that the defendant had "no adequate alternative" to breaking the law. *Cleveland v. Anchorage*, 631 P.2d 1073, 1078 (Alaska 1981). To determine whether a defendant had an "adequate alternative" to breaking the law, one must ask two questions. First, would a reasonable person in the defendant's position have perceived that an alternative course of action was available? Second, if an alternative course of action was available, was that alternative course "adequate"?

The majority opinion treats both of these questions as issues of fact that should be determined by the jury. However, Alaska law on this subject (indeed, case law from around the country) shows that this second question—the "adequacy" of a particular available alternative—is a question of law for the court. This is because "adequacy" is a legal conclusion.

A defendant who raises the defense of necessity may have had several alternative courses of action open to them. To call one or more of these alternatives "adequate" means that the law requires a person in the defendant's position to pursue that alternative rather than break the law. Courts—and Alaska courts in particular—have consistently treated the "adequacy" of particular alternatives as a question of law. That is, while the trier of fact decides whether a particular alternative course of action was in fact available to the defendant, and whether a reasonable person in the defendant's position would have perceived that this alternative was available, the court decides whether the unpursued alternative course of action was legally "adequate".

In the present case, it was undisputed that Seibold knew that he had alternative courses

2. We have done some limited research on the derivation of the Alaska statute. Alaska's pre–1978 "malicious mischief" did not contain the phrase, "having no right to do so or any reasonable ground to believe the person has such a right." The 1976 preliminary report of the Criminal Code Revision included in the criminal mischief statute the words, "having no right to do so." The commentary says, "Under this draft, one who honestly but unreasonably believes he has a right to deal with the property in the way he does is covered." The commentary also says that the statute is "derived from the New York Revised Penal Law § 145 et seq" and is "almost identical to the Oregon Code."

By the time of the 1977 Tentative Draft of the Criminal Code Revision, the phrase had evolved to the language: "having no right to do so or any reasonable ground to believe he has such a right." Alaska Criminal Code Revision, Part IV at 17 (Ten. Draft 1977). The commentary to the draft says only: "Common to each degree of criminal mischief is the requirement that the defendant have no right nor any reasonable ground to believe he has a right to interfere with the property."

AS 11.46.484 was enacted using the language of the 1977 Tentative Draft in § 4 ch 166 SLA 1978. The 1978 Senate Journal Supplement No. 47, which contains commentary to the 1978 Criminal Code, contains no reference to the enigmatic phrase.

Both the Oregon and New York statutes use the phrase, "having no right to do so nor reasonable ground to believe that the person has such a right." The New York statute is accompanied by commentary that says:

> Finally, defendant must have no right to damage the property of another nor any reasonable ground to believe that he/she has such right. Notably, the crime is not committed where there is a reasonable, but mistaken, belief in the right to destroy the property in question. Thus, if A intentionally destroys property of B, under the mistaken but reasonable belief that A has title to such property, A is not guilty of criminal mischief.

New York Penal Code Sec. 145, commentary at 61 (1988) (citations omitted).

of action. The trial judge denied Seibold's request for a jury instruction on the defense of necessity because the judge ruled that two of these alternatives were "adequate"—that is, Seibold was legally obligated to pursue these alternatives rather than violate the law by destroying his neighbors' property.

It was the trial judge's proper role to decide this issue of law. And, because I conclude that the trial judge reached the correct legal conclusion, I would affirm Seibold's conviction.

### Facts of the case

Following a collision between their two vehicles, Dean Seibold and Paul Knopp became involved in an altercation at the Knopp residence. The men's wives also became involved: Patty Seibold arrived in a separate vehicle, and Laure Knopp came out of the house. Laure Knopp was carrying a camcorder in her hands, and she had a 9 mm pistol in a holster.

Seibold grabbed the pistol and took control of it. In addition, one of the Seibolds contacted the State Troopers by radio and summoned them to the scene. The two couples separated and stood beside their respective vehicles. While everyone was waiting for the troopers to arrive, Seibold used a crowbar and then a rock to destroy the pistol. Patty Seibold then left the scene in her vehicle. After the troopers arrived and investigated the occurrence, Seibold was charged with third-degree criminal mischief for his act of destroying the Knopps' handgun.

At his trial, Seibold testified that he destroyed the pistol because he thought "it was necessary to just destroy the usefulness of the gun", that it was "critical at that time to render [the gun] unusable". Seibold was asked why he didn't give the pistol to his wife, who was leaving in her separate vehicle. Seibold answered that this was not an option because "Patty doesn't like guns". Seibold was also asked why he didn't simply lock the weapon in his truck. Seibold answered that he "didn't want to have anything to do with [the pistol]. I didn't consider that an option. It didn't cross my mind."

At the end of the trial, Seibold asked Superior Court Judge *pro tem* Charles R. Pengilly to instruct the jury on the defense of necessity. Judge Pengilly, however, ruled that the evidence did not justify an instruction on necessity. The judge stated:

> [T]here is simply no evidence to justify a conclusion that [Seibold's] belief that the gun had to be destroyed was a reasonable [belief]. There were certainly several adequate alternatives.... Among [these alternatives were] the option of giving the pistol to Mrs. Seibold for safekeeping ... [or] the pistol could simply have been put in[to] the cab of [Seibold's] pickup. There was no indication that the Knopps were in any way making a move towards retrieving the pistol.... [T]here is no evidence [to support] ... an objectively reasonable belief [that the pistol had to be destroyed]. So there will be no necessity instruction as to the damage to the [pistol].

### The law of necessity

Under AS 11.81.320(a), the common-law defense of "necessity" is available as an affirmative defense in all criminal prosecutions unless the legislature has plainly indicated an intent to prohibit this defense to someone in the defendant's situation. The rationale of the necessity defense is founded on public policy: "[T]he law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 5.4, Vol. 1, p. 629.

In *Cleveland v. Anchorage*, 631 P.2d 1073, 1078 (Alaska 1981), the Alaska Supreme Court described this defense as having three elements: (1) the defendant's violation of the law must have been done to prevent a significant evil, (2) there must have been no adequate alternative method to prevent this evil, and (3) the harm caused by the defendant's violation of the law must not have been disproportionate to the foreseeable harm that the defendant was trying to avoid. *Cleveland*'s description of these three elements is deceptively simple; the three enumerated

components of the defense actually present a mix of questions of fact and questions of law.

As can be inferred from the wording of Judge Pengilly's ruling, Seibold's case hinges on the second element of the necessity defense. Was there no adequate alternative to Seibold's act of destroying the pistol?

In *Cleveland*, addressing this second element of the defense, the supreme court stated that a defendant must prove that they acted reasonably. That is, the defendant must prove that they reasonably believed, when they violated the law, that there was no adequate alternative means to forestall the threatened harm. *Cleveland*, 631 P.2d at 1078.

*Cleveland* states that the reasonableness of the defendant's belief is to be assessed from the viewpoint of a reasonable person in the defendant's position. *Id.* Judge Coats's majority opinion interprets this statement from *Cleveland* as meaning that the defendant's belief about the existence (or non-existence) of an adequate alternative is simply a question of fact, a question to be resolved by the jury. This is not wholly accurate.

Say, for instance, that a man walks out of his house carrying a number of envelopes that he intends to mail, and also a prescription that he intends to fill. He drives to his local mailbox and, distractedly, he shoves the prescription through the mail slot along with the envelopes. Realizing his error, he then uses a crowbar to break open the mailbox and retrieve his prescription. Can he assert the defense of necessity if he is prosecuted for damaging government property?

To decide whether there was an adequate alternative path of action available to the defendant, one must of course look to the facts. How essential was it that the man procure the medicine? Could he have asked a postal employee to open the mailbox and retrieve the prescription for him? Or could the man have obtained a replacement prescription from his doctor's office? How long would this have taken, and how quickly did he need the medicine? These are all questions of fact.

However, once the facts are established, a question of law still remains. Assume that the evidence shows that a reasonable person in the defendant's position would have known that the defendant's medical condition was not life-threatening; without the medicine, the man would be in significant pain, but he would still be able to pursue his normal activities. Assume also that the evidence shows that a reasonable person in the defendant's position would have known that the defendant could obtain a replacement prescription, but not until the next morning. Under these facts, is waiting until the next morning an "adequate alternative" to breaking into the mailbox?

This is a question of law for the court. Professors LaFave and Scott discuss this issue:

> The defense of necessity applies when the defendant is faced with [the] choice of two evils[.] ... If, however, there is open to him a third alternative, which will cause less harm than will be caused by violating the law, he is not justified in violating the law.... [For instance, a] starving man is not justified in stealing from a grocery if he can obtain food by presenting himself at a soup kitchen. A prisoner subjected to inhuman treatment by his jailors is not justified in breaking prison if he can bring about an improvement in his conditions by other means [*i.e.*, through administrative or judicial channels].

*LaFave & Scott, supra,* § 5.4(d)(5), pp. 638–39.

Obviously, the existence of alternative courses of action involves questions of fact. For instance, was there a soup kitchen available to the starving man? Or was the prison inmate being subjected to such severe mistreatment that he might not survive to seek relief through official channels?

However, assuming that the facts show that an alternative was available (and that a reasonable person in the defendant's position would have perceived the alternative), the next question is a legal one: was that alternative "adequate", in the sense that the law requires a person in the defendant's position to pursue that alternative rather than break the law?

This distinction was recognized by the Alaska Supreme Court in *Nelson v. State*, 597 P.2d 977 (Alaska 1979). In *Nelson*, the defendant drove his vehicle off the Steese Highway and down a side road, where it became stuck in a marsh about 250 feet off the highway. After an hour's unsuccessful labor trying to free his vehicle, Nelson had a friend drive him to a nearby Highway Department maintenance yard. There, Nelson stole two Department vehicles (a dump truck and a front-end loader) and used them to free his vehicle. Both of the government vehicles sustained considerable damage in the process. Nelson was prosecuted for joyriding and for reckless destruction of personal property (under the former criminal code). *Nelson*, 597 P.2d at 977–78.

Nelson raised the defense of necessity, and the trial judge did instruct the jury on this defense. Nelson was, nevertheless, convicted. On appeal, Nelson argued that the necessity instruction given by the trial judge was flawed. The supreme court, however, held that Nelson had not been entitled to a necessity instruction in the first place. The court ruled that Nelson failed to present a *prima facie* claim of necessity because he had had adequate alternatives to breaking the law.

The supreme court agreed with Nelson "that the necessity defense is available if a person acted in the reasonable belief that an emergency existed and that there were no alternatives available[,] even if that belief was mistaken." *Nelson*, 597 P.2d at 979. Read by itself, this passage makes it sound as if the availability of adequate alternatives were a pure question of fact, an issue to be decided by the jury. However, the remainder of the *Nelson* opinion makes it clear that the court was saying something a little different.

The supreme court ultimately ruled that Nelson had not been entitled to any instruction on necessity because

it [cannot] be said that Nelson had no lawful alternatives in his situation. The record shows that[,] during the time Nelson was trying to free [his] vehicle[,] people stopped on several different occasions and offered their services in the form of physical assistance, rides, or offers to telephone [the] state troopers or a tow truck. *Nelson*, 597 P.2d at 980. The supreme court clearly did not think that the adequacy of these alternatives was a question of fact to be decided by the jury at Nelson's trial. The court simply held (as a matter of law) that these possibilities were adequate lawful alternatives to breaking the law.

If there had been some factual dispute as to whether these alternatives were truly available to Nelson, that would have been an issue for the jury. Similarly, if the evidence undisputedly showed that these alternatives were available, but there was some dispute as to whether a reasonable person in Nelson's position would have perceived the availability of these alternatives, that too would have been an issue for the jury. But the evidence was undisputed that Nelson knew these alternatives were available. That left only one question: whether these alternatives were "adequate"—whether the availability of these alternatives precluded any claim of necessity. The supreme court treated this last question as an issue of law. The court held that the offers of help from passing motorists constituted adequate lawful alternatives to Nelson's decision to violate the law. Since it was undisputed that Nelson was aware of these offers of help, he was not entitled to a necessity instruction.

The existence of an adequate alternative course of action makes a difference in several areas of the criminal law. Sometimes the legislature enacts rules for deciding the adequacy of the defendant's alternative. For example, with regard to self-defense (a defense that is based on much the same policies as the defense of necessity), the Alaska Legislature has adopted rules regarding the alternative of safe retreat. In most circumstances, a person who is threatened with imminent deadly attack, and who might otherwise be entitled to use deadly force in self-defense, must take advantage of an opportunity to retreat with safety. However, the legislature has declared that an opportunity to retreat with safety can be disregarded— that is, safe retreat is not an "adequate" alternative—if the attack occurs on the person's property, or if the person under attack

is a police officer engaged in his or her duties. *See* AS 11.81.335(b).

With the defense of necessity, the Alaska Legislature purposely chose a different path: the rules governing the defense of necessity would be developed by the courts under their power to declare the common law.[1] As this court explained in *Wells v. State*, 687 P.2d 346 (Alaska App.1984), the drafters of Alaska's criminal code

> declin[ed] to adopt a detailed statutory formulation [of the necessity defense]. Instead, the necessity defense was incorporated into the Revised [Criminal] Code "to the extent permitted by common law" [subject to] the qualifications described in subsections (1) and (2) [of AS 11.81.320(a)].
>
> The [Criminal Code Revision] Subcommission concluded ... that "it is more appropriate to leave this issue to the judiciary[.] [T]he rarity of the defense and the imponderables of the particulars of specific cases convinces us that the courts can better define and apply this defense than can be done through legislation."

*Wells*, 687 P.2d at 349. (The internal quotations in this passage are from the Alaska Criminal Code Revision, Tentative Draft (1977), Part II, pp. 48–49.)

In other words, when the issue of necessity is raised in a criminal trial, the courts are charged with two duties. The first duty is to fulfill the courts' normal role of ensuring that the parties have a fair opportunity to litigate all the legal issues properly raised in the case. But the second duty is different: with regard to the defense of necessity, the legislature has directed the courts to act as lawgivers and not just referees. It is the duty of the courts to declare the law of necessity—to define the scope and the limits of the

defense through the process of deciding individual cases.[2]

While such a role is unusual for courts, it is not without precedent. Both the Alaska Supreme Court and this court have exercised our common-law authority to define the scope and the elements of various criminal law defenses. For instance, in *Miller v. State*, 462 P.2d 421, 426 (Alaska 1969), the supreme court held that a person may not use force to resist an unlawful but peaceable arrest. The supreme court ruled that it was "not too much to ask that one believing himself unlawfully arrested should submit to the officer and thereafter seek his legal remedies in court." *Id.* at 427. In other words, unless the arresting officer uses excessive force to make the arrest, the arrestee's alternative of seeking legal redress is, by law, an "adequate" alternative (even though it is conceivable that, if the issue were tried to a jury, some juries might disagree).

This court reached a similar result in *Jurco v. State*, 825 P.2d 909, 914–15 (Alaska App.1992); we held that a person is not entitled to use force to resist an official seizure of their property, even if the person reasonably believes that the seizure is illegal. Again, seeking redress in the courts is, by law, an "adequate" alternative—even though reasonable people on the jury might disagree.

Turning to cases that directly involve the defense of necessity, the Alaska Supreme Court ruled in *Cleveland* that abortion protesters can not rely on the doctrine of necessity to justify trespass at medical clinics or other conduct that physically impedes the performance of abortions. The court essentially held that, given the fact that abortion is legal, the protesters' alternatives of political

---

1. "[T]he common law is dynamic, not static; ... it reflects the evolution of law through court decisions.... [I]n the absence of statute, it is [an] appellate court's duty to explicate the common law which will apply unless and until the Alaska legislature acts to modify it." *Wells v. State*, 687 P.2d 346, 348–49 (Alaska App.1984).

2. Federal courts recognize the same principle. *See United States v. Schoon*, 971 F.2d 193, 196–97 (9th Cir.1991):

> In some sense, the necessity defense allows [courts] to act as individual legislatures, amending a particular criminal provision or crafting a one-time exception to it, subject to court review, when a real legislature would formally do the same thing under those circumstances. For example, by allowing prisoners who escape a burning jail to claim the justification of necessity, we assume [that] the lawmaker, confronting this problem, would have allowed for [such] an exception to the law proscribing prison escapes.

agitation and public debate on the issue of abortion must be deemed "adequate", and actual disruption of abortions can not be justified by the doctrine of necessity, even when the protesters' motive is to prevent the imminent performance of abortions. *Cleveland,* 631 P.2d at 1078–1081.

The supreme court obviously viewed its ruling in *Cleveland* as the resolution of a question of law—the announcement of a rule that would be applied in future cases, regardless of the particular facts. In other words, it is not for juries to decide in individual cases whether political agitation is an "adequate" alternative for protesters who want to stop abortions. That issue has been resolved by defining the scope of the necessity defense—as a matter of law.

Courts in other jurisdictions have reached the same conclusion: the "adequacy" of a factually available alternative course of action is a question of law for the courts, not a question of fact for the jury. For instance, in *State v. Marley,* 54 Haw. 450, 509 P.2d 1095 (1973), the court upheld the trespass convictions of anti-war protesters against the contention that their actions were needed to help stop unjustified killing. The court held that, as a matter of law, other lawful forms of protest constituted an "adequate" alternative to the anti-war protesters' act of trespass, and thus the protesters could not rely on the doctrine of necessity:

> Where there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. Other forms of non-criminal protest were and are available to [the] defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view [as] harmful.

*Marley,* 509 P.2d at 1109 (citations omitted).

*Accord, United States v. Seward,* 687 F.2d 1270, 1275–76 (10th Cir.1982) (necessity defense not available to protesters at a nuclear power plant site); *United States v. Cassidy,* 616 F.2d 101 (4th Cir.1979) (even assuming that the United States' possession of nuclear weapons was illegal, the necessity defense was not available to protesters who damaged government property at the Pentagon).

In *Schnabel v. State,* 663 P.2d 960 (Alaska App.1983), this court employed similar reasoning when we rejected a miner's assertion that his decision to cross a salmon stream with heavy equipment was justified by "necessity". The normal summer road to the mine was closed, and the only way to deliver the equipment to the site was to cross a salmon stream. The bridge across the stream was too narrow to accommodate the heavy equipment, so Schnabel drove the equipment through the stream. *Id.* at 961–62. The trial judge refused Schnabel's request to instruct the jury on the defense of necessity, and this court upheld the trial judge's decision. This court ruled that Schnabel could not claim "necessity" because Alaska law gave him an adequate alternative: the law allowed Schnabel to seek a waiver of the normal prohibition against using wheeled vehicles in a salmon stream, and also granted him administrative (and ultimately judicial) review if his waiver application was denied.

It is important to note that Schnabel's administrative remedies were deemed "adequate" even though there was no guarantee that Schnabel would ultimately be granted what he desired—permission to cross the stream. We stated that Schnabel's administrative remedies were adequate because they "provided a forum for weighing and balancing the loss or damage to Schnabel from not crossing the stream against potential damage to the fish in the stream should he be permitted to cross—the precise determination that is in issue whenever. the defense of necessity is raised." *Schnabel,* 663 P.2d at 966. In other words, because an administrative procedure existed wherein Schnabel could argue that his personal interests outweighed the normal prohibition against crossing the salmon stream with wheeled vehicles, this court held that Schnabel had no right to litigate this question to the jury at his criminal trial—that Schnabel "failed to satisfy the 'some evidence' test as a matter of law". *Id.*

Although cloaked in the language of the "some evidence" test, this court's ruling amounted to a decision of a point of law, a decision limiting the scope of the necessity defense. No matter how compelling Schnabel's particular need to cross the stream

might have been, and no matter how reasonable his actions might have appeared in hindsight, he was not entitled to a jury instruction on the defense of necessity, and he was not entitled to have the jury determine the reasonableness of his actions. *Schnabel* holds that, as a matter of law, people in Schnabel's situation must pursue administrative remedies rather than violate the law.

This court issued a similar ruling in *Wells v. State, supra,* a case involving a prisoner who escaped from prison and raised the defense of necessity. Wells offered two justifications for his escape.

First, Wells asserted that prison officials were ignoring his medical and psychological needs. Apparently because prisoners can seek administrative (and, ultimately, judicial) review of decisions made by corrections officials regarding their medical care, this court held that Wells's "evidence [of purported medical neglect] was insufficient as a matter of law to raise a necessity defense". *Wells,* 687 P.2d at 350–51. This was a decision defining and limiting the defense of necessity. This court in effect held that, no matter how well-founded Wells's complaints of medical neglect might have been, he was not entitled to raise them at his criminal trial as justification for his escape.

Wells's second purported justification for escaping was his claim that he faced a danger of physical injury at the hands of fellow inmates who were angered because Wells had revealed their intention to commit theft. This court held that "this evidence [of possible attack] would have been sufficient to [raise] the [defense] of necessity *if there had been some evidence suggesting that Wells tried unsuccessfully to obtain protection within the institution*". *Id.* at 351. Again, in other words, this court ruled that, regardless of how well-founded Wells's fear of attack might have been, the defense of necessity was not available to him—as a matter of law—because he failed to pursue administrative remedies.

Similar reasoning was applied in *Gerlach v. State,* 699 P.2d 358 (Alaska App.1985), a case in which a parent claimed that her act of custodial interference was justified by necessity. This court ruled that, even if Gerlach

legitimately and reasonably feared that her estranged husband was neglecting and/or physically mistreating their child, she could not raise the defense of necessity because "Gerlach, like [the defendant in *Schnabel*], had ready remedies at law.... She was involved in an ongoing custody dispute and was represented by counsel.... Her failure to avail herself of [legal remedies] precludes her reliance on a necessity defense." *Gerlach,* 699 P.2d at 362.

*Applying the law to the facts of Seibold's case*

Seibold asserted that he destroyed the Knopps' pistol to prevent the possibility that the Knopps would attack him, regain possession of the pistol, and then use the weapon against him or his wife. Obviously, a threatened harm to the Seibolds' life or physical safety could easily outweigh the Knopps' property interest in the pistol. The question, however, is whether Seibold had any adequate alternatives to destroying the pistol.

As Judge Pengilly noted in his ruling, "[t]here was no indication that the Knopps were in any way making a move towards retrieving the pistol." Under those circumstances, Judge Pengilly ruled, Seibold had at least two adequate alternatives to destroying the pistol. One option was to give the pistol to his wife for safekeeping. (She was getting ready to leave in her separate vehicle.) Another option was to lock the pistol inside the cab of Seibold's pickup until the troopers arrived. (The troopers had been summoned and were en route.)

As explained above, Seibold was asked about these alternative courses of action when he testified at trial. With respect to the first alternative (giving the pistol to his departing wife), Seibold said that he did not do this because his wife "doesn't like guns". With respect to the second alternative (locking the pistol in his truck), Seibold said that he "didn't want to have anything to do with [the pistol]". He added that he "didn't consider that an option".

Under these facts, it is essentially undisputed that a reasonable person in Seibold's position would have understood that these

alternative courses of action were available to him. Thus, Seibold's case is legally equivalent to the case the Alaska Supreme Court confronted in *Nelson*—the case of the truck owner whose vehicle became stuck in marshy ground and who waved aside offers of help from passing motorists, deciding instead to help himself to some heavy equipment from a nearby Highway Department maintenance yard.

In both Seibold's and Nelson's cases, the evidence clearly showed that the defendants had alternatives to breaking the law. The issue was whether those available alternatives were "adequate"—whether the law required the defendant to pursue those alternatives rather than break the law. The supreme court in *Nelson* treated this issue as a question of law, and Judge Pengilly acted properly when he did the same.

Because the adequacy of Seibold's alternatives is an issue of law, on appeal this court must assess *de novo* the adequacy of the available alternatives. I reach the same conclusion as Judge Pengilly: Seibold's alternatives were "adequate".

Seibold asserted that he did not give the pistol to his departing wife because his wife was not comfortable with guns. I would hold that the Knopps' interest in having their property returned to them outweighed the possibility that Seibold's wife might be discomforted by a brief possession of a firearm in her vehicle. Seibold asserted that he did not lock the pistol in the cab of his truck because he "didn't want to have anything to do with [it]". Again, I would hold that the Knopps' interest in having their property returned to them outweighed Seibold's desire to be done with the pistol, his desire not to concern himself with the weapon any more.

Because Judge Pengilly properly treated the adequacy of Seibold's alternatives as a question of law, and because I conclude that Judge Pengilly correctly resolved that question of law, I would affirm Judge Pengilly's refusal to instruct the jury on the defense of necessity, and I would therefore affirm Seibold's conviction.

STEWART, J., not participating.