NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| CELESTY NOEL FARMER,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-12097<br>Trial Court Nos. 1CR-13-00184 CR &<br>1CR-13-00186 CR<br><br>O P I N I O N<br><br>No. 2654 — August 30, 2019 |

Appeal from the Superior Court, First Judicial District, Craig, David V. George, Judge.

Appearances: David A. Graham, Graham Law Firm, Sitka, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and James E. Cantor, Acting Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, and Allard and Wollenberg, Judges.

Judge WOLLENBERG.

Celesty Noel Farmer was charged in three cases based on separate incidents occurring in 2013. These three cases were joined for trial.

In one of the cases, the State charged Farmer with third-degree criminal mischief for causing damage in an amount of $500 or more to the fishing boat of her ex-

husband, Donald Yates.[1] This charge was based on Farmer's act of cutting the ropes to Yates's boat while it was tied up at the dock in Klawock on Prince of Wales Island. Farmer conceded that she set the boat adrift, but she argued that her conduct was justified on the ground of necessity. The trial court refused to instruct the jury on the defense of necessity.

The jury acquitted Farmer of third-degree criminal mischief but convicted her of the lesser included charge of fourth-degree criminal mischief for causing damage to the boat in an amount of $50 or more.[2] The jury also acquitted Farmer of criminal trespass in connection with this incident.

In the second and third cases, the State charged Farmer with two counts of driving while her license was revoked (DWLR) — one for an incident in February 2013 and another for an incident in July 2013. The jury acquitted Farmer of the February 2013 charge, but the jury convicted Farmer of the July 2013 charge and a related charge of violating her conditions of release from the February DWLR charge.[3]

On appeal, Farmer raises several challenges to her convictions. First, Farmer argues that the trial court erred in declining to instruct the jury on the defense of necessity in relation to the criminal mischief charge. Second, Farmer argues that the court should have dismissed the July DWLR and the related violating conditions of release charge because of prosecutorial misconduct. Finally, Farmer contends that the prosecutor misrepresented the evidence to the jury during his rebuttal closing argument. We reject these claims and affirm Farmer's convictions.

---

[1]   Former AS 11.46.482(a)(1) (2013).

[2]   Former AS 11.46.484(a)(1) (2013).

[3]   Former AS 28.15.291(a)(1) (2013) and former AS 11.56.757(a), (b)(2) (2013), respectively.

Farmer also challenges the restitution judgment issued in connection with her criminal mischief conviction. At sentencing, the trial court ordered Farmer, as a condition of her probation, to pay restitution of $9,797 for setting the boat adrift.[4] Farmer argues that the court lacked the legal authority to impose any restitution in excess of $499.99 — the upper end of the damages range for fourth-degree criminal mischief. We conclude that the judge had the authority to order restitution for the actual damages or losses caused by Farmer's criminal conduct.

*Background facts*

Farmer and Yates had a long-term relationship and had two children together. They were married in 2009, after having been together for nine years. However, in 2011, Farmer filed for divorce, and by fall 2012, the divorce was final.

Yates was a commercial fisherman who owned a forty-two-foot wooden troller that Yates often lived aboard. As part of the divorce settlement, Yates retained the title to, and possession of, the boat.

According to Farmer's testimony, Yates was physically and verbally abusive to her for years. Farmer testified that in January 2013, the year following their divorce, Yates assaulted her, and she reported the incident to the police. Yates fled onto his boat, and he eluded the police for the next ten days. Yates eventually turned himself in, pleaded guilty to fourth-degree assault, and was released from custody in early February 2013.

Farmer testified that, after Yates's release, Yates moved next door to her despite the existence of a no-contact order, and he began contacting her and threatening her with harm if she turned him in again. A few days later, Yates asked Farmer if he

---

[4] AS 12.55.100(a)(2)(B).

could take his son fishing after school. Farmer told him he could not, which led to an argument.

Farmer testified that, later that day, Yates sent her a text message saying that he was taking his son. Farmer asserted that she only had five minutes to get to the bus stop where her son would be dropped off from school, but she did not have a driver's license. She said that she tried reaching a friend and calling a taxi, to no avail. She testified that she felt she had no other option than to drive in order to prevent Yates from taking her son. (This conduct was the basis for the first DWLR charge. The jury credited Farmer's necessity defense and acquitted her of this charge.)

A few months later, on the night of April 16, 2013, Farmer went onto Yates's boat to retrieve a laptop that Yates had borrowed from Farmer's mother. Farmer testified at trial that Yates gave her permission to board the boat to get the laptop. Yates denied giving Farmer permission to board the boat, but he conceded that he had never prohibited Farmer from going aboard the boat.

Farmer stopped by the boat when she knew Yates was at a friend's house. As Farmer was getting off the boat with the laptop, she used a knife to cut the boat loose from the dock. Farmer testified at trial that she had "made a huge mistake" and "wasn't thinking at [the] time" when she cut the ropes. She testified that Yates had made comments in the past about using the boat to hurt people who cared about her. Farmer testified that she thought Yates would be returning to the boat shortly that evening and that cutting the ropes "would have been a point, you know? Just leave me alone, you know?"

However, Yates did not return to the boat that evening, and it floated away from the dock and grounded on a nearby island. Yates and many members of the community worked for two days to pull the boat off the beach during a high tide.

Based on the April incident involving Yates's boat, the State charged Farmer with third-degree criminal mischief and first-degree criminal trespass. The jury acquitted Farmer of both charges but found her guilty of the lesser included offense of fourth-degree criminal mischief.

The two other charges for which Farmer was convicted — the July 2013 DWLR and violating conditions of release charges — were based on a separate incident. Yates was not involved in this incident. (We discuss the facts and procedural history of these charges later in this opinion.)

At sentencing, the court ordered Farmer to pay $9,797 in restitution in connection with the criminal mischief conviction.

*Farmer's claim that the trial court erred in refusing to give a necessity instruction as to the criminal mischief charge*

Prior to trial, Farmer gave notice of her intent to assert a defense of necessity in relation to the criminal mischief charge. The trial court declined to instruct the jury on this defense. Farmer appeals the trial court's ruling.

A defendant is entitled to a jury instruction on the defense of necessity if the defendant presents "some evidence" that: (1) the charged offense was committed to prevent a significant evil; (2) there was no adequate alternative to the charged offense; and (3) the foreseeable harm from the unlawful conduct was not disproportionate to the harm avoided by breaking the law.[5] "Some evidence" is "evidence that, viewed in the

---

[5] *State v. Garrison*, 171 P.3d 91, 94-95 (Alaska 2007); *McGee v. State*, 162 P.3d 1251, 1261 (Alaska 2007); *Seibold v. State*, 959 P.2d 780, 782 (Alaska App. 1998). While the necessity defense is normally an affirmative defense to be proved by the defendant, Alaska's criminal mischief statute is written in such a way that, when a defendant presents some evidence to sufficiently raise the defense in a criminal mischief case, the State bears the

(continued...)

light most favorable to the defendant, would allow a reasonable juror to find in the defendant's favor on each element of the defense."[6]

In the trial court, Farmer argued that the statements she made to the police after she set the boat adrift supported her request for a necessity instruction. Specifically, she pointed to statements that she was scared for her physical safety based on Yates's threats and his past actions. She contended that she believed, based on prior experience, that the police could not protect her. She asserted that she cut the mooring lines to prevent Yates from following through on his threat to use the boat to stalk her or to hurt her or others, and to prevent him from using the boat to again avoid apprehension by the police. She argued that she reasonably perceived that any potential property damage to the boat by setting it adrift was not disproportionate to the bodily harm she sought to prevent.

The trial court declined to instruct the jury on the defense of necessity in relation to the criminal mischief charge, finding that Farmer had failed to present "some evidence" on the second and third elements of the defense. The court acknowledged that Farmer had presented evidence that she was truly scared of Yates. But the court found no evidence suggesting that Farmer faced imminent harm, or that she needed to cut the boat loose that night to avert imminent harm. The court noted that cutting the boat loose would not have made Yates any less dangerous to Farmer. The court also found that Farmer had a number of legal alternatives to cutting the boat loose, including going to

---

5    (...continued)
ultimate burden of proving beyond a reasonable doubt that the defendant had no reasonable ground for believing his actions were necessary. *McGee*, 162 P.3d at 1260-61.

6    *McGee*, 162 P.3d at 1261.

the police or obtaining a domestic violence restraining order.[7]   Finally, the court concluded that any future threat of harm to Farmer was outweighed by the risk that cutting the boat loose in the middle of the night could cause harm to the boat, as well as to other boats and boaters.[8]

After independently reviewing the record in this case, we agree with the trial court that Farmer did not present evidence sufficient to entitle her to a necessity instruction on the criminal mischief charge.[9]

*Farmer's claim that the trial court should have dismissed the July 2013 charges*

Farmer argues that the trial court should have dismissed the July 2013 DWLR charge (and the related violating conditions of release charge) after the prosecutor told the jurors during his opening statement that they would hear from a particular witness, but the prosecutor later excused the witness from her subpoena.

The July DWLR charge against Farmer was based on Farmer's allegedly driving with her friend, Cathia Demmert.  Alaska State Trooper John Ryan testified that he observed Farmer driving past him in the opposite direction while they were in a construction zone.  Ryan noticed Farmer because she was waving her hand outside the driver's side window and honking her horn in a friendly manner to get the attention of

---

[7]   *See Seibold*, 959 P.2d at 783; *Gerlach v. State*, 699 P.2d 358, 363 (Alaska App. 1985).

[8]   *See Garrison*, 171 P.3d at 97 (holding that the third prong of the necessity defense requires consideration of the reasonably foreseeable harm that could result from the unlawful conduct, not just the actual harm that did or did not result).

[9]   *Id.* at 95 ("If the evidence, when viewed in the light most favorable to the defendant, fails to support one or more elements of a proposed defense, the defendant is not entitled to a jury instruction on that defense."  (citing *Ha v. State*, 892 P.2d 184, 190 (Alaska App. 1995))).

the flagger. Ryan was aware that Farmer's license was revoked, and he turned his vehicle around to follow her.

Ryan stopped the vehicle about a mile down the road. By that time, he found Demmert in the driver's seat, and Farmer in the passenger seat. But Ryan noticed that the driver's seat was positioned so far forward that the steering wheel was pressing against Demmert, thus suggesting that Demmert would have found it difficult, if not impossible, to drive the vehicle.

Farmer denied that she had been driving the vehicle. She told Ryan that she had been leaning over Demmert in the driver's seat to wave, and that Demmert had been leaning into the back seat to buckle in a child.

Ryan reported that Demmert admitted to switching places with Farmer before Ryan reached the car.[10]

Prior to trial, Farmer's attorney expressed concern that the prosecutor might refer to Demmert's assertion but not call Demmert to testify, thus potentially violating Farmer's right to confrontation.[11] The prosecutor told the court that Demmert had been subpoenaed and that he expected her to testify. He said that if she did not appear, he would ask for a warrant for her arrest.

In his opening statement later that day, the prosecutor told the jury that Demmert would testify that she switched places with Farmer before the traffic stop.[12]

---

[10] The parties disputed whether Demmert actually made this admission. Outside the presence of the jury, the judge found that the tape recording of the incident gave rise to a "reasonable inference" that Demmert made the admission.

[11] U.S. Const. amend. VI; Alaska Const. art. I, § 11; *see also Crawford v. Washington*, 541 U.S. 36 (2004).

[12] The prosecutor actually mistakenly switched Demmert's and Farmer's names, but his intent was clear, and neither party suggests the jury would have misunderstood what the

(continued...)

But then, on the next day of trial (which was two days later), the prosecutor announced that Demmert was in Anchorage getting treatment — which the prosecutor himself had approved earlier in the month — and would not be in court to testify. The prosecutor told the court that he did not realize until the previous morning that Demmert was in Anchorage, and he explained that the State had decided not to pay the expense of flying her in from Anchorage, so she had been excused from her subpoena.

Farmer's attorney reminded the court that he had raised this issue before trial to avoid precisely this situation. He maintained that the jury had been "tainted" by the prosecutor's opening statement referring to Demmert's anticipated testimony, and he argued that the unavailability of Demmert for cross-examination violated his client's right to confrontation. (He also suggested that Demmert would not testify as the State had anticipated. In response to this latter argument, the trial court noted that Farmer herself could subpoena Demmert, if she wished.)

Farmer's attorney argued that, even though the prosecutor's opening statement was not evidence, it was impossible to "unring the bell." However, Farmer's attorney refused to request a mistrial.

Instead, Farmer's attorney argued that dismissal of the July 2013 DWLR charge was the only appropriate remedy. The court ruled that there was no legal authority to dismiss the case; the court also concluded that there was no manifest necessity to order a mistrial. The court found that a "self-help remedy" is "usually more than sufficient" in this type of situation — that is, Farmer's attorney could ask the jury to infer that the State did not present Demmert to testify because her testimony would actually have favored Farmer. (Farmer's attorney did exactly that in his closing argument.)

---

[12] (...continued)
prosecutor meant.

On appeal, Farmer does not challenge the court's denial of a mistrial. Instead, she argues that the court abused its discretion by denying her motion to dismiss. But rather than renew her claim that the prosecutor's statements violated her right to confrontation, Farmer now argues that the prosecutor's actions — in informing the jury of Demmert's alleged statement and then excusing her from her subpoena — constituted misconduct entitling her to a dismissal.

Farmer acknowledges that the trial judge made no findings about the prosecutor's good or bad faith, but she argues that "the facts of this case speak clearly for themselves." While one might have concerns about the prosecutor's unilateral decision to release Demmert from her subpoena given the parties' discussion of this issue before trial and the prosecutor's remarks in his opening statement, Farmer's attorney never asked the court to rule on a claim of prosecutorial misconduct, nor did he request factual findings that would allow this Court to evaluate such a claim. Under these circumstances, we conclude that this claim is not preserved for appeal.[13]

Moreover, on this record, we cannot say that the trial court abused its discretion in denying an outright dismissal of the DWLR charge. As a general matter, the proper remedy in this situation would either be a curative instruction or a mistrial.[14] But instead of asking for a mistrial, Farmer's attorney availed himself of the "self-help"

---

[13]    *See, e.g.*, *Randall v. State*, 583 P.2d 196, 200-01 (Alaska 1978).

[14]    *See Muller v. State*, 478 P.2d 822, 827 (Alaska 1971); *see also Worley v. State*, 2013 WL 1933108, at *3-4 (Alaska App. May 8, 2013) (unpublished) (upholding judge's decision to deny a mistrial where the prosecutor stated in opening that a witness would testify, but the witness later became unavailable, and noting that while convictions have been reversed on that ground, such cases are the exception to the normal presumption that jurors will obey the cautionary and limiting instructions of the trial judge (citing *Lau v. State*, 175 P.3d 659, 663 (Alaska App. 2008); *Dailey v. State*, 65 P.3d 891, 897 (Alaska App. 2003))).

remedy suggested by the judge. The attorney told the jury, "I don't think Ms. Demmert was ever going to come in here and tell you anything like that."[15]

For these reasons, we affirm the trial court's denial of Farmer's motion to dismiss.

*Farmer's claim that plain error occurred when the prosecutor misrepresented the documentary evidence during closing argument*

Farmer raises a second prosecutorial misconduct claim related to the prosecutor's use of phone records to impeach Farmer's credibility. Before discussing this claim, some additional background is necessary.

As we mentioned earlier, Yates pleaded guilty to fourth-degree assault against Farmer in January 2013 and spent a short time in jail. Upon his release in February 2013, Yates was under an order not to contact Farmer. Farmer testified that, later that day, she received a text from Yates from his new phone. Farmer did not know it was Yates at first because he was texting from a new number. She responded and learned that the text messages were coming from Yates. The phone records admitted at trial corroborated Farmer's testimony as to how these events transpired.

However, during the prosecutor's cross-examination of Farmer, and in the prosecutor's closing argument, the prosecutor took the position that Farmer, not Yates, had initiated the contact and sent the first message, and that the phone records did not show a text message from Yates prior to any message sent by Farmer. Farmer's attorney did not object to this argument.

---

[15] As part of her prejudice argument, Farmer argues that the prosecutor capitalized on his own alleged misconduct in a portion of his closing argument. We disagree with Farmer's characterization of this argument and its purported correlation with the prosecutor's statement in opening. Moreover, Farmer did not renew her motion to dismiss at that time.

On appeal, Farmer argues that the prosecutor's comments constituted plain error.[16]

Although Farmer contends that the prosecutor's comments constituted plain error, Farmer does not explain why the trial court had an obvious obligation to intervene under these circumstances. The attorneys' respective examinations of Farmer demonstrated that the parties disputed the meaning of the phone records. The trial court could not have recognized the error without being asked to directly inspect the records themselves.

Even if Farmer had objected, there is no reason to believe she would have been entitled to a mistrial. The judge instructed the jury that it was their job to "determine what the evidence was, and what conclusions should be drawn from that evidence," that the arguments of counsel are not evidence, and that the jury should disregard any argument that departed from the evidence. We presume that the jury followed this instruction.[17] Farmer also discussed the prosecutor's error in her own closing argument.

Finally, even assuming that the prosecutor's argument was an error that would have been obvious to any competent judge, Farmer was not prejudiced by this error. The jury acquitted Farmer of the DWLR charge that was based on Farmer's act of driving to pick up her son that occurred just days after the text messages at issue in this claim. In order for the jury to have acquitted Farmer, they would have had to believe

---

[16] *See Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) (to show plain error of non-constitutional magnitude, a defendant must show that (1) the failure to object was not the result of intelligent waiver or a tactical reason not to object, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error was prejudicial).

[17] *See Coffin v. State*, 425 P.3d 172, 175 (Alaska App. 2018) ("As a general matter, jurors are presumed to follow the instructions that they are given[.]" (citing *Whiteaker v. State*, 808 P.2d 270, 277 (Alaska App. 1991))).

Farmer's necessity defense: that she was scared that Yates was going to take their son and had no choice but to drive. The jury apparently found Farmer's fear credible, notwithstanding any potential misunderstanding about the phone records. The fact that the jury convicted Farmer on the fourth-degree criminal mischief charge, based on events that happened two months after the February text messages, does not persuade us that she was prejudiced by the prosecutor's argument.

We therefore find no plain error arising from this claim.

*Facts underlying Farmer's restitution claim*

As we mentioned earlier, Farmer was charged with third-degree criminal mischief for cutting the ropes to Yates's boat while it was tied up at the dock. Farmer admitted that she committed the conduct charged, but she disputed whether her conduct had caused $500 or more in damage. The jury accepted her position and found her guilty of the lesser included offense of fourth-degree criminal mischief (*i.e.*, damage of at least $50).

Following trial, the State filed a request for $61,620 in restitution. This amount was in large part based on an estimate provided by a shipwright for the cost of repairing Yates's boat. It also included reimbursement for the cost of the oil booms that the City of Craig deployed to prevent oil contamination from the April 2013 grounding, fees to haul out Yates's boat for an estimate of damages and repairs, and lost fishing income stemming from Yates's inability to fish in the immediate aftermath of the April 2013 grounding.

Farmer's attorney moved to limit restitution. Farmer's attorney argued that the trial court lacked the legal authority to award more than $499.99 in damages because the jury had found Farmer not guilty of third-degree criminal mischief (damage in an

amount of $500 or more) and had convicted her only of fourth-degree criminal mischief (damage in an amount of at least $50).

The trial court rejected this argument, ruling as a matter of law that it was not barred from awarding restitution of $500 or more. The court noted that "a finding of not guilty is not an affirmative factual finding. It's a finding that the State failed to prove something; it failed to prove something beyond a reasonable doubt." The court reasoned that the jury had found only that the evidence was insufficient to establish beyond a reasonable doubt that Farmer caused damage of $500 or more. The court noted that, in determining restitution, a court applies the lower "preponderance of the evidence" standard.[18]

The trial court then held a restitution hearing and received testimony from Yates, Farmer, the shipwright who provided the estimate, and a former crew member of Yates's. After this hearing, the trial court ordered Farmer to pay, as a condition of her probation, restitution of $9,797. This amount was broken down into four categories of expenses:

| | |
|---|---|
| Keel shoe and cooler tubes | $1,800 (labor costs only) |
| Haul-out and fuel to haul-outs | $1,577 |
| Oil booms | $420 |
| Lost fishing income | $6,000 |

The court did not award restitution for the bulk of the State's request for repairs to Yates's boat because the court found that the boat was in poor condition prior to the April 2013 grounding. (Yates had previously run his boat aground while under power, and there was evidence that the boat had been in need of significant maintenance for many years.)

---

[18]　*See* AS 12.55.025(i); *Noffsinger v. State*, 850 P.2d 647, 650 (Alaska App. 1993).

The court concluded, however, that the damage to the keel shoe and keel cooler tubes was caused by the 2013 grounding, noting that "[t]here was ample testimony the keel directly contacted the beach when the boat grounded." This finding was consistent with the shipwright's testimony that the damage to the keel likely occurred "within a year or maybe two" due to a grounding not under power. (The grounding caused by Farmer occurred in April 2013, and the restitution hearing was held in August 2014.) Based on the shipwright's estimate, the court awarded $1,800 in labor costs attributable to the repair of the keel shoe and keel cooler tubes, but the court did not order costs for materials since the estimate had not itemized the materials' cost.

*Farmer's claim that the trial court was legally barred from awarding restitution of more than $499.99*

On appeal, Farmer does not challenge the trial court's findings that Farmer was responsible for causing the damages and losses for which the trial court awarded restitution. Rather, Farmer argues that no matter what the real damages are, the trial court lacked the legal authority to impose restitution greater than $499.99 — the maximum amount of damages specified in the fourth-degree criminal mischief statute. In particular, Farmer argues that restitution above this amount is precluded by both AS 12.55.100(a)(2)(B) and the double jeopardy clause.

We first address Farmer's statutory argument. Under AS 12.55.-100(a)(2)(B), a court may order a defendant, as a condition of probation, to pay restitution "for actual damages or loss caused by the crime for which conviction was had."[19] Farmer argues that since she was convicted of fourth-degree criminal mischief, the "crime for which conviction was had" capped restitution at $499.99.

---

[19] AS 12.55.100(a)(2)(B).

Farmer's statutory argument is contrary to our decision in *Fee v. State*.[20] Fee pleaded no contest to one count of criminal mischief for damaging the property of another in an amount of $50 or more but less than $500.[21] The sentencing judge ordered Fee to pay restitution in an amount exceeding $500.[22] Like Farmer, Fee argued that AS 12.55.100(a) precluded the court from ordering restitution that exceeded the maximum amount of damages specified in the applicable criminal mischief statute since (according to Fee) such an amount exceeded the "actual damages or loss caused by the crime for which conviction was had."[23]

We rejected Fee's argument. We held that under AS 12.55.100(a) (and additionally, under AS 12.55.045, the statute permitting the imposition of restitution as a direct component of a defendant's sentence), the sentencing judge could require Fee to pay restitution for the "actual damage suffered by the victim as a result of Fee's crime," even if this amount exceeded the maximum damages specified in the applicable criminal mischief statute.[24] We further concluded that "[i]n determining whether as a matter of fact, the defendant committed the higher crime, the doctrine of collateral estoppel has no part to play."[25] We stated that "[w]here the defendant is charged with

---

[20]   *Fee v. State*, 656 P.2d 1202 (Alaska App. 1982).

[21]   *Id.* at 1203-04.

[22]   *Id.* at 1203.

[23]   *Id.* at 1204.

[24]   *Id.* at 1205-06.

[25]   *Id.* at 1205 (citing *Huckaby v. State*, 632 P.2d 975, 976 n.2 (Alaska App. 1981)).

the lesser offense but the evidence establishes that he committed the greater offense, a restitutionary award based on the actual loss to the victim is appropriate."[26]

Farmer argues that *Fee* is distinguishable from her case because a jury actually acquitted her of the greater offense. But we have not limited this rationale to plea situations. For instance, in *Harris v. State*, we explained that while restitution is limited to "the specific crime for which the defendant was convicted," a judge is "free to determine the actual loss resulting from that crime, independent of the jury verdict, so long as the trial court's award was based upon substantial evidence."[27]

Farmer's argument conflates the requirement that restitution be based on the defendant's criminal conduct — *i.e.*, the requirement that restitution be awarded only for damages *caused* by the defendant — with the amount of damages that defined the degree of her offense.[28] The conduct for which Farmer was convicted was intentionally damaging Yates's property; the amount of damages that could be proved beyond a reasonable doubt merely determined the classification of her crime.[29]

Additionally, while the crime of criminal mischief is defined by the value of damage to property, both statutes governing restitution — AS 12.55.100(a)(2)(B) and AS 12.55.045 — define a broader class of harm. Under these statutes, a sentencing court

---

[26] *Id.*

[27] *Harris v. State*, 678 P.2d 397, 408 (Alaska App. 1984), *rev'd on other grounds*, *Stephan v. State*, 711 P.2d 1156 (Alaska 1985); *see also Salvato v. State*, 814 P.2d 741, 744 (Alaska App. 1991) (noting the authority holding that "the trial court is not bound by jury verdicts in determining restitution awards").

[28] *See Campbell v. State*, 5 S.W.3d 693, 699 (Tex. Crim. App. 1999) (en banc) (holding that limiting restitution to the property-value range reflected in a verdict "confuses the property-value range of a particular grade of theft with the requirement that restitution have a factual basis in the record").

[29] *Compare* former AS 11.46.482(d) (2013) *with* former AS 11.46.484(b) (2013).

may order restitution for "actual damages or loss" — *i.e.*, those losses directly and indirectly caused by a defendant's conduct.[30] Thus, while a restitution award will likely include the property damage found by a jury in a criminal mischief case, it is not *limited* to that amount of damage.

Moreover, the criminal statutes and the restitution statutes serve different purposes.[31] The purpose of the criminal statutes — and a criminal trial — is to determine an individual's culpability. The legislature has made clear, however, that a primary aim of restitution is to compensate victims for the losses caused by a defendant's criminal act.[32] Precluding full restitution for the actual damages caused by the defendant's criminal conduct would thwart this aim.

In support of her statutory argument, Farmer relies almost exclusively on the Alaska Supreme Court's decision in *Hagberg v. State*.[33] We disagree with Farmer that *Hagberg* involved "precisely the same" issue as this case. In *Hagberg*, the

---

[30]   *See Welsh v. State*, 314 P.3d 566, 567-68 (Alaska App. 2013) (construing restitution statutes to authorize courts to impose restitution for actual damages or loss); *see also* AS 12.55.045(d) (permitting restitution for loss of income); *Riley v. State*, 60 P.3d 204, 223 (Alaska App. 2002) (upholding restitution, in an assault case, for airfare for victim to return home to parents' residence to recover); *Reece v. State*, 881 P.2d 1135, 1138 (Alaska App. 1994) (upholding restitution, in sexual abuse of a minor case, for victim's future costs of counseling).

[31]   *See Campbell*, 5 S.W.3d at 698 (discussing the distinction between criminal responsibility for conduct and the judge's later restitution award).

[32]   *See* AS 12.55.045(a)(1) (requiring courts determining restitution to take into account the "public policy that favors requiring criminals to compensate for damages and injury, including loss of income, to their victims"); *Ortiz v. State*, 173 P.3d 430, 432-33 (Alaska App. 2007) (holding that restitution both compensates a victim for harm done by a defendant's criminal act and also has penal implications).

[33]   *Hagberg v. State*, 606 P.2d 385 (Alaska 1980).

defendant was acquitted of grand larceny but convicted of petty larceny — a fact pattern similar to Farmer's case.[34] But the trial court awarded restitution within the value range for petty larceny, and therefore, the supreme court had no occasion to consider whether an award of restitution that exceeded the upper end of the value range for petty larceny was statutorily permissible.[35] Rather, the question on appeal was whether the restitution award was based on a reasonable interpretation of the jury's verdict, since there were multiple ways to interpret the jury's verdict under the facts of that case.[36]

As we noted earlier, Farmer does not contest the factual basis for the jury's verdict. That is, Farmer does not contest that her actions caused damage to the keel shoe and cooler tubes of Yates's boat, or that her actions resulted in the other losses attributed to her in the restitution judgment.

We therefore hold that the trial court was not statutorily barred from awarding more than $499.99 in restitution.

We next address Farmer's constitutional challenge. Farmer argues that restitution is a form of punishment, and thus, restitution in excess of the damages found by the jury punishes Farmer for a crime for which she was acquitted and violates her double jeopardy rights. We have certainly recognized the punitive aspects of restitution, concluding that restitution is a "hybrid remedy" that both "further[s] the aim of compensating the victim" and has "penal characteristics."[37]

But as the trial court recognized, Farmer's jury found only that the State had failed to establish beyond a reasonable doubt that Farmer had caused damages of $500

---

[34] *Id.* at 386.

[35] *Id.*

[36] *Id.* at 386-87.

[37] *Ortiz*, 173 P.3d at 433.

or more. The jury made no finding as to what level of damages the State could prove by a preponderance of the evidence. And as we discussed earlier, the jury was never asked to consider what additional losses, aside from direct damages to Yates's property, Farmer's conduct may have caused.

In several analogous contexts, we have held that the double jeopardy clause does not bar a court from relying on conduct for which the defendant has been acquitted. For example, we permit sentencing judges to rely on conduct for which a defendant was acquitted in enhancing a defendant's term of imprisonment — if the judge concludes, based on substantial evidence, that the defendant actually committed the crime for which he was acquitted:

> The reason why double jeopardy and due process are not implicated when a person who has been acquitted of certain conduct is sentenced on the basis that the conduct occurred, rests on the differing burdens of proof. In order to convict a defendant of an offense, the state must prove guilt beyond a reasonable doubt. In contrast, a trial court imposing sentence, may rely on any information that is verified in the record.[38]

Given the higher standard of proof at a criminal trial, Alaska courts have also consistently held that the prohibition on double jeopardy does not preclude a civil suit for damages based on the same conduct for which a defendant was acquitted or for which restitution was not ordered in the criminal case.[39] And the double jeopardy clause

---

[38] *Brakes v. State*, 796 P.2d 1368, 1372 (Alaska App. 1990); *see also Huckaby v. State*, 632 P.2d 975, 976 n.2 (Alaska App. 1981) (noting that a jury's decision (or lack of decision) does not collaterally estop the trial judge in making factual findings at sentencing that are inconsistent with the jury's findings: "The difference in burden of proof makes collateral estoppel unavailable.").

[39] *See Wyatt v. Wyatt*, 65 P.3d 825, 831 & n.21 (Alaska 2003); *Reyes v. State*, 978 P.2d

(continued...)

does not preclude a court from finding, by a preponderance of the evidence, that a defendant has violated probation based on conduct for which the defendant was previously acquitted.[40]

Farmer likens her case to *Howell v. State*, but that case is inapposite.[41] In *Howell*, the defendant was charged with felony driving under the influence. Before the second portion of a bifurcated trial, the trial court granted a partial judgment of acquittal, ruling that the State's proposed evidence was insufficient to establish the "prior convictions" element.[42] The State challenged the court's decision on appeal, and this Court held that whatever the merits of the State's position, the double jeopardy clause barred the State from re-litigating Howell's guilt of *felony* driving under the influence, given the judgment of acquittal.[43]

*Howell* is distinguishable from Farmer's case. In *Howell*, the State was asking for an opportunity to re-litigate the felony classification of Howell's conduct — a felony of which Howell had already been acquitted. Here, there is no dispute that Farmer remains convicted of a misdemeanor. Rather, the State sought restitution for the entirety of damages or losses stemming from Farmer's conduct.

We note that other courts considering this issue have upheld restitution awards that exceeded the value limits for the defendant's crime — even when the

---

[39] (...continued)
635, 641 (Alaska App. 1999).

[40] *See, e.g.*, *Portalla v. State*, 2006 WL 3691697, at *1 (Alaska App. Dec. 13, 2006) (unpublished) (citing *Andrew v. State*, 835 P.2d 1251, 1254 (Alaska App. 1992); *A.S. v. State*, 761 P.2d 122, 124 (Alaska App. 1988)).

[41] *Howell v. State*, 115 P.3d 587 (Alaska App. 2005).

[42] *Id.* at 589, 592.

[43] *Id.* at 592.

defendant was acquitted of a higher-value crime — based in part on the lower burden of proof at sentencing.[44]

We similarly conclude that the trial court did not violate Farmer's double jeopardy rights when it determined, by a preponderance of the evidence, that her criminal conduct resulted in actual damages of more than $500. (Farmer does not argue that she was entitled to have a jury — as opposed to the judge — make this determination.[45])

---

[44] *See, e.g.*, *Ex Parte Stutts*, 897 So.2d 431, 433-34 (Ala. 2004) (upholding restitution award exceeding the criminal mischief limit despite the defendant's acquittal of the higher degree of offense, noting the different burdens of proof); *State v. Fancher*, 818 P.2d 251, 252 (Ariz. App. 1991) ("Because restitution is neither punishment nor an element of the offense, we conclude that a trial court has the authority to order restitution in full for damages caused by the criminal offense."); *State v. Johnson*, 711 P.2d 1295, 1298 (Haw. 1985) (holding that regardless of monetary limits in the convicted crime, "[t]he total amount of the restitution ordered by the trial court should be the actual loss or damage incurred by the victim"); *State v. Terpstra*, 546 N.W.2d 280, 283 (Minn. 1996) (holding that "a guilty verdict within specific monetary parameters in a criminal case does not control the total amount of restitution that can be ordered for that offense" due to the lesser standard of proof and noting that any damages not proven beyond a reasonable doubt by the State at trial could be awarded in a civil action anyway); *Campbell v. State*, 5 S.W.3d 693, 698 (Tex. Crim. App. 1999) (en banc) ("Conviction by the jury for a certain property-value does not restrict the restitution amount that the trial judge might find to be the justified amount."); *State v. Selland*, 772 P.2d 534, 535 (Wash. App. 1989) (restitution is not limited to the damages limit of the crime for which the defendant was convicted, but only to the act for which the defendant was convicted). *But see Peralta v. State*, 596 So.2d 1220, 1220 (Fla. Dist. App. 1992) (restitution ordered as to direct losses may not exceed the value charged by the offense; however, indirect losses may result in higher restitution imposed); *People v. Chapin*, 597 N.E.2d 1250, 1255 (Ill. App. 1992) (defendant could only be ordered to make restitution in amount of theft for which he was convicted).

[45] *See, e.g.*, *Hester v. United States*, 139 S.Ct. 509, 509-11 (2019) (Gorsuch, J., dissenting from the denial of certiorari), *cited in Her v. State*, 2019 WL 3318138, at *4 & n.18 (Alaska App. July 24, 2019) (unpublished).

We therefore reject Farmer's claim that the trial court was legally barred from awarding restitution that exceeded the maximum amount of damages specified in the fourth-degree criminal mischief statute.

*A note on defense counsel's potential conflict of interest*

Although we affirm the judgments in Farmer's cases, we would be remiss if we failed to comment on a potential conflict of interest that we identified in our review of the record.

As we discussed earlier, as part of Farmer's defense, Farmer's attorney sought to establish Yates's history of violence against Farmer and in particular, Farmer's fear that Yates might use his boat to hurt her or to evade apprehension by the police. During the trial, it became clear that Farmer's attorney had previously represented Yates in a 2011 case in which he was convicted of assaulting Farmer. This prior representation potentially created a conflict of interest for defense counsel in representing Farmer.[46]

Neither party has briefed this issue, and there has not been an evidentiary hearing to further explore the potential conflict[47] and whether it adversely impacted

---

[46]    *See* Alaska R. Prof. Conduct 1.7(a)(2) & Alaska R. Prof. Conduct 1.9(a), (c); *see also Richard B. v. State*, 71 P.3d 811, 818-20 (Alaska 2003) ("Where the previous representation and current litigation cover the same or substantially related matters and the current client's interests are materially adverse to those of the former client, the lawyer shall not represent the current client unless the former client consents." (citing Alaska R. Prof. Conduct 1.9(a))).

[47]    *See Lane v. State*, 1994 WL 16196204, at *3 (Alaska App. Mar. 23, 1994) (unpublished) (suggesting that in order to demonstrate that an attorney's past representation of a former client is inconsistent with the attorney's representation of the current client, the defendant must show either: (1) that the earlier representation was "substantially and particularly related to counsel's later representation of defendant," or (2) that "counsel actually learned particular confidential information during the prior representation of the witness that was relevant to the defendant's later case" (quoting *Smith v. White*, 815 F.2d
(continued...)

Farmer's case.[48]  (We note that Farmer is privately represented by the same attorney on appeal.)  If Farmer wishes to pursue this issue, she may file a post-conviction relief action within the time limits set out in AS 12.72.020.

*Conclusion*

We AFFIRM the judgments of the superior court.

---

[47]  (...continued)
1401, 1405-06 (11th Cir. 1987))).

[48]  *See Newby v. State*, 967 P.2d 1008, 1014 (Alaska App. 1998) (holding that to establish an ineffective assistance of counsel claim based on a conflict (other than joint representation), a defendant must generally show (1) an actual conflict of interest, and (2) that this conflicting interest adversely affected the defense attorney's representation of the defendant).